Appeal of MUSICAL INSTRUMENT SALES COMPANY.     Docket No. 218.

The capital of the taxpayer as of June 1, 1914, which can be considered in fixing the invested capital for the calendar year 1919, was $165,000.

Submitted December 3, 1924; decided January 27, 1925.

R. C. Cooley, Esq., for the taxpayer.

A. R. Marrs, Esq. (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before IVINS, KORNER, and MARQUETTE.

This appeal on its merits presents the sole issue of the amount of the capital of the taxpayer on June 1, 1914, which amount it is

agreed constituted the invested capital of the taxpayer from that date to the end of the calendar year 1919. The appeal was heard on a stipulation of facts.

FINDINGS OF FACT.

1. Taxpayer is a corporation organized under the laws of the State of New York on July 11, 1912. The organization of this corporation was for the purpose of furthering the sale of pianos and piano parts manufactured by the Kohler interests, together with an exclusive jobbers' contract with the Victor Talking Machine Co., and covering the sale of products of that company. The so-called Kohler interests comprised the Autopiano Co., the Milton Piano Co., the Brambach Piano Co., and Kohler & Campbell, Inc.

2. Immediately after its organization the taxpayer entered into contracts with the chain of so-called " Claflin Stores," known as the " Associated Dry Goods Company." The contracts with these stores provided for the equipment of special departments therein for the exploitation and sale of the products of the companies mentioned above. The equipment and maintenance of these special departments was at the expense of the taxpayer. Such equipment included, in some instances, specially constructed concert halls, special booths, offices, stock rooms, etc. The taxpayer relied for its ultimate profits on the huge volume of business expected to be secured by the operation of these departments in the large retail stores.

3. Mr. Charles Kohler was the dominating personality in this venture. He owned outright Kohler & Campbell, Inc., and owned the controlling interest in the other companies referred to above as the " Kohler interests."

4. In the year 1913, and prior to the death of Charles Kohler, the taxpayer had a cash paid-in capital stock issued and outstanding of $200,000, consisting of 2,000 shares of a par value of $100 each. Of these 2,000 shares, 1,120 shares were owned by Charles Kohler, 400 shares by Richard W. Lawrence, and 410 shares by C. A. Wagner.

5. The $200,000 cash capital of the taxpayer was not sufficient to supply the necessary funds for the extensive business program of the taxpayer, and Charles Kohler personally, or one or more of his companies, indorsed or guaranteed the obligations of the taxpayer for such amounts as the taxpayer was unable to obtain otherwise. On June 14, 1913, Charles Kohler died suddenly. At that time the bills and accounts payable of the taxpayer amounted to $1,319,164.44, exclusive of its capital stock liability. Over $1,000,000 of the above-mentioned amount of indebtedness was personally guaranteed by Charles Kohler or by one or more of the corporations controlled by him.

6. The death of Charles Kohler precipitated a crisis in the taxpayer's affairs because of its financial dependence on Charles Kohler and the corporations controlled by his estate. Richard W. Lawrence was appointed one of the executors of the estate of Charles Kohler and as such executor he entered into negotiations with the taxpayer, the corporations controlled by the Kohler estate, and the creditors of the taxpayer, looking to the solution of the taxpayer's financial difficulties.

7. As a result of the negotiations referred to, Richard W. Lawrence was, by agreement of all parties, appointed liquidating trustee. The taxpayer transferred to him, as such liquidating trustee, all the assets of the taxpayer, exclusive of good will. Richard W. Lawrence, as liquidating trustee, agreed to pay, and did pay, all indebtedness of the taxpayer and likewise agreed with the taxpayer to relieve it from all further liability to the estate of Charles Kohler or to the companies controlled by that estate, which might arise from any deficiency in assets of the taxpayer to meet such liability. In addition thereto the liquidating trustee agreed to secure from all the stockholders of the taxpayer the surrender of all their shares of the capital stock of the taxpayer (2,000 shares) and *to return to the taxpayer corporation* all of such shares of its capital stock. This the liquidating trustee did. The entire issue of the shares of capital stock of the taxpayer (2,000 in number) was surrendered by its shareholders and was thereupon returned by the liquidating trustee *to the taxpayer corporation*.

8. About this same time certain parties, among whom were certain of the stores in which the products of the taxpayer had been sold under its former plan of operation, agreed that if the taxpayer were freed of any and all indebtedness and liabilities of every kind, they would purchase from the taxpayer corporation 1,650 shares of its capital stock so returned to it, as set out in paragraph 7 above. The agreed price to be paid for such stock was its par value of $100 per share. This agreement was carried out and these certain parties, none of whom were former shareholders of the taxpayer corporation, did purchase from the taxpayer 1,650 shares of its capital stock which had been returned to it, as set out in paragraph 7 above. The consideration for the 1,650 shares was $165,000 in cash, which was paid into the treasury of the taxpayer by these purchasers. Of the 2,000 shares of its capital stock which had been returned to it by its shareholders as aforesaid, 350 shares were left in the treasury of the taxpayer after the 1,650 shares, above referred to, had been sold. These 350 shares still remain in the treasury of the taxpayer and none of them had been sold at the end of 1919.

9. The settlement of the taxpayer's affairs by the liquidating trustee, as above set out, disclosed the following condition of taxpayer as of June 1, 1914: The taxpayer owed bills payable of $997,470.36 and accounts payable of $321,694.08, a total of $1,319,164.44. In addition to these obligations there were unliquidated claims not appearing on taxpayer's books for damages against taxpayer for breaches of contracts. These unliquidated obligations were also assumed by the liquidating trustee. The assets of the taxpayer as shown by its books amounted to $1,179,349.59. The taxpayer's liabilities exceeded its assets in the amount of $139,814.85, and this amount was exclusive of its unliquidated liabilities and exclusive of its liability on its original capital stock issue of $200,000.

10. At the time the new stockholders purchased the 1,650 shares of taxpayer's capital stock returned to it by its former stockholders as above stated, the taxpayer corporation was without liabilities of any description; it was likewise without assets of any description except the good will referred to in paragraph 7. It was also without stockholders, directors, or officers. When the new stockholders

had purchased the 1,650 shares of stock above referred to, and had paid $165,000 cash therefor into the treasury of the taxpayer, they took over the taxpayer corporation and reestablished it in business as a going concern. The taxpayer had a continuous existence as a corporate entity from the date of its incorporation on July 11, 1912, down to and including the calendar year 1919.

11. On audit of the taxpayer's returns of income and profits taxes for the years 1917, 1918, and 1919, the Commissioner assessed an additional tax for the years 1917 and 1918. The assessments for these years were made prior to January 1, 1924. These assessments were so-called " N. C. 250 (d)" assessments, i. e., made without the taxpayer having had the benefit of section 250 (d) of the revenue act of 1921. The deficiency determined for the year 1919 has not been assessed. The taxpayer filed claims in abatement for the years 1917 and 1918 and protested the proposed additional tax for 1919. After a hearing and audit on the three years above mentioned the Commissioner adjusted the taxpayer's liability for those years and as a result thereof he determined that a deficiency exists for the years 1917 and 1919 in the amount of $21,851.76 and an overassessment for the year 1918. On August 6, 1924, the Commissioner notified the taxpayer by registered letter of the deficiency determined, in the amount of $21,851.76, and from such determination the taxpayer appealed to this board. Petition was filed September 20, 1924.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final decision of the Board will be settled on consent or on seven days' notice, in accordance with Rule 50.

### OPINION.

KORNER: The petition alleges that the taxes in controversy are income and profits taxes for the calendar years 1917, 1918, and 1919. The Commissioner admits that the income and profits taxes for the year 1919 are properly here in issue, but denies that the years 1917 and 1918 are properly involved in this appeal, for the reason that the additional tax for the year 1917 was assessed prior to June 2, 1924, and for the reason that the deficiency letter appealed from indicates an overassessment for the year 1918. The taxpayer contends that while it is true that a certain purported assessment was attempted to be made in connection with its tax for the year 1917, such assessment was wholly illegal and void because made without benefit to the taxpayer of section 250(d) of the Revenue Act of 1921.

The only issue joined in his appeal, on the merits, is the amount of the taxpayer's capital as of June 1, 1914, at the time when the taxpayer began business under the new management, as set forth in the Findings of Fact. The capital of the business as of that date is claimed by the taxpayer as its invested capital for the three years 1917, 1918, and 1919. The Commissioner concedes this to be the fact. The amount of capital as of June 1, 1914, determined by the Commissioner to be the proper invested capital for the calendar year 1919, has been applied by him throughout the three years mentioned, with the resulting deficiency from which this appeal is taken. No

question is raised in this appeal as to the jurisdiction of this board to hear and determine the deficiency as to the year 1919. Since such deficiency is wholly predicated (in so far as this appeal is concerned) on the amount of the capital of the taxpayer as of June 1, 1914, this board is in position to consider and determine the amount of such capital as of the date mentioned without the necessity of passing on the issue of jurisdiction of this Board as to the years 1917 and 1918 under the circumstances raised by the pleadings. And since we must hold that the amount of invested capital was correctly determined by the Commissioner, no prejudice results to the taxpayer by our failure to express opinion on the jurisdictional issue. If the contention of the taxpayer were to be allowed as to taxpayer's capital at June 1, 1914, the necessity of resolving the jurisdictional issue would be patent.

The taxpayer contends that its capital as of June 1, 1914, and at all times since that date, was as follows:

| | |
|---|---|
| (1) 2,000 shares of original paid-in capital stock at time of organization | $200,000.00 |
| (2) Donated surplus, due to the release by the Kohler interests of its liability to them on account of their indorsements | 139,814.85 |
| (3) 2,000 shares of original capital stock surrendered by former stockholders to the taxpayer at time of the liquidation of its assets and liabilities, of which 1,650 shares were subsequently sold to other interests for $165,000 and 350 shares remained in its treasury | 200,000.00 |
| Total capital as of June 1, 1914 | 539,814.85 |

The Commissioner contends that on or about June 1, 1914, there was a complete liquidation of this corporation; that every liability was liquidated and extinguished, including the liability on its capital stock; that its assets were surrendered; that every element of corporate life was extinguished with the exception of its bare existence under its charter as a corporate entity within contemplation of law; that the payment by new interests into its treasury of $165,000 in exchange for shares of its capital stock held in its treasury constituted the whole of its capital stock from that time forward.

We are of opinion that the position of the Commissioner is the proper one. The decisions and rulings cited by the taxpayer in support of his contention all contain a significant element of fact different from that presented here. In those cases the stock in question was sold or transferred by the holders thereof to other parties in the process of reorganization. In such cases there resulted only a change in stock ownership—in the personnel of the corporate organization. The liability of the corporation on such capital stock remained constant. The contributions made to the corporation and with which it operated its business, constituting its "invested capital," were not affected by the transaction. The persons concerned were entitled to have a fair return on such "invested capital" before the earnings in excess thereof became subject to the profits tax.

But in the instant appeal quite a different state of facts exists. There was not a transfer of stock between the several stockholders of the corporation or between stockholders and persons who had not prior to such action been stockholders. Here there was a surrender by the stockholders of their stock (the entire capital stock of the corporation) to the corporation itself. With this stock in its treas-

ury it had no stockholders and no liability on its stock to any person. The investment represented by the shares theretofore issued and outstanding no longer existed. It was entirely liquidated. The corporation owed no one. It had no assets except a so-called *good will*. The corporation had operated for only about a year and had never realized a profit. It had in that short period become totally insolvent. Not a scintilla of evidence was offered as to the value of such good will or to show that it actually had an existence. Under the circumstances we conclude that such good will, if not indeed nonexistent, was of negative or only nominal value. The corporation had no stockholders, directors, or officers. Through the surrender to it by its stockholders of all its outstanding shares of stock, the liquidation of its assets, the payment of its entire indebtedness, which wiped out its previous operating deficit, the corporation was left without stockholders and without obligations or relationships with respect to stockholders, creditors, or any other person. All that it can be said to have had were its charter and its stock certificates unissued in its treasury. It was then in the position of a corporation which had just been chartered by the State and had not yet held an organization meeting or issued any stock to its subscribers. Under these circumstances we do not see that the taxpayer corporation had an " invested capital." Its past was dead, its future powerless to be born without the contribution of capital assets with which to do business. Such capital assets were contributed by new parties in the amount of $165,000 in exchange for *its* capital stock held by *it* in *its* treasury. It thus began life anew with a cash paid-in capital of $165,000. That is all that can be said to have been invested in the company at that time, and that amount represented its " invested capital."

In light of what has been said we are unable to see that the 350 shares of capital stock remaining in the corporate treasury can be said to have had a value as invested capital. To us it seems that such shares of stock were in all respects similar to authorized, but unissued, shares of a newly formed corporation. If and when these shares are exchanged for capital assets, the value of such assets may become invested capital. Until such time, in our opinion, these 350 shares do not have a value for invested capital purposes.

Our opinion is that on June 1, 1914, the capital of the taxpayer was $165,000 and that this amount, with the proper adjustments thereto, constituted the invested capital of the taxpayer to be used as a basis for computing the tax here in controversy. The tax should be computed accordingly.